| | | |
|---|---|---|
| DELLA MORGAN | * | CIVIL DOCKET |
| | * | |
| VERSUS | * | NUMBER: 14-1719 |
| | * | |
| MARLIN N. GUSMAN, | * | SECT. |
| ORLEANS PARISH SHERIFF; | * | |
| DR. SAMUEL GORE; DR. MICHAEL | * | |
| HIGGINS; VINCENT DILEO, as executor of | | |
| Estate of Dr. MARCUS DILEO; | * | |
| CHIEF EARL WEAVER; | * | |
| LT. KENT JOHNSON; | * | |
| ORLEANS PARISH SHERIFF | * | |
| DEPUTIES ANDERSON, JACKSON, | * | JUDGE |
| AND COLEMAN; K. DAVIS; | * | |
| R. GATES; L. PHIPPS; P. MACKIE; | * | |
| V. GABRIEL; S. WATSON; V. NEWIS; | * | |
| AND JOHN DOES #1-6 | * | |

**************************************

## COMPLAINT

1.     This case involves the entirely preventable death of Clifton Morgan, a young man with a history of psychiatric problems who, when he found himself incarcerated at Orleans Parish Prison (OPP) in September 2013, was unjustifiably and without reason deprived of the psychotropic medications he had been taking for three years.  Although Mr. Morgan pleaded with the defendants to provide him his medication, and repeatedly told them that he was feeling suicidal, the defendants refused to provide him proper care.  Mr. Morgan consequently spiraled into a deep depression, including a near-catatonic episode that warranted hospitalization.   But despite the obvious risk that Mr. Morgan might harm himself, the defendants moved him off suicide watch and directly into general population just two days after he returned from the

hospital. They then isolated him in a room with ample means to harm himself. A short while later, he was dead, apparently by hanging.

2. Mr. Morgan's death is part of a pattern, practice, and culture of deliberate indifference and culpable negligence towards inmates' serious medical needs, including risk of suicide, while in custody of the Orleans Parish Sheriff's Office (OPSO). Instead of providing adequate, appropriate, and necessary care and treatment to Mr. Morgan, the defendants failed in their professional duties and their legal obligations. Mr. Morgan was treated in a callous, harsh, and indifferent manner by the defendants, resulting in his death by suicide. The defendants failed to properly diagnose, treat, and care for Mr. Morgan while he was in their custody. He was denied appropriate and necessary medical, psychiatric, nursing and therapeutic care, treatment and supervision. Instead of receiving proper care, Mr. Morgan was deprived of his medication and left alone in a cell with ample means to harm himself, after he had repeatedly informed defendants of his intent to harm himself. The defendants' mistreatment of Mr. Morgan contravened the community standard of care and violated applicable federal and state constitutional and statutory standards.

3. The defendants' actions and omissions, manifested in inadequate medical screening and intake, inadequate training and supervision of staff, inadequate facilities, inadequate policies and procedures relating to diagnosis and treatment of mentally ill and suicidal persons in custody, as well as inadequate medical care, treatment, and monitoring of Mr. Morgan, were directly and causally related to Mr. Morgan's death.

4. The instant case is yet another example of an intransigent pattern, practice, and culture of deliberate indifference and culpable negligence that has resulted in at least 43 in-custody deaths at OPSO since April 2006.

# I.     JURISDICTION

5.     This action is brought pursuant to 42 U.S.C. §§ 1983, pursuant to the First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, Section 504 of the Rehabilitation Act of 1973 which authorizes actions to redress discrimination based on disability and handicap, Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131, 42 U.S.C. § 1988 and 42 U.S.C. § 12205, et seq. Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343, and the aforementioned statutory and constitutional provisions. Plaintiff also invokes supplemental jurisdiction over claims under state constitutional and statutory law pursuant to 28 U.S.C. §1367.

# II.     PARTIES

## (Plaintiff)

6.     **DELLA MORGAN** is an adult citizen of the State of Louisiana and is domiciled in the Eastern District. She is the mother of Clifton Morgan, who never married and died without children.

## (Defendants)

**Named defendants herein are:**

7.     **MARLIN N. GUSMAN**, in his individual and official capacity as Sheriff of Orleans Parish, is an adult citizen of the State of Louisiana and domiciled in the Eastern District of Louisiana. At all times described herein, he was the Sheriff of Orleans Parish and, as such, was responsible for the hiring, training, supervision, discipline, and control of the deputies under his command, as well as medical personnel. He was responsible for all actions of OPSO staff. He was also responsible for the supervision, administration, policies, practices, customs, and operations of the Orleans Parish Sheriff's Office and its correctional facilities. He was and is a

final policy maker.  He is liable both directly and vicariously for the actions complained of herein.

8.      **DR. SAMUEL GORE** was the Medical Director of the Orleans Parish Sheriff's Office and was an employee of the Orleans Parish Sheriff's Office at all times relevant to this Complaint.  At all pertinent times herein he was responsible for the provision of medical care and health care services for persons incarcerated in OPSO facilities, both directly and as a supervisor.  He was responsible for recommending and hiring qualified health care professionals and staff; insuring adequate staffing for the medical needs of prisoners; and for the supervision, training, discipline and oversight of personnel and medical services at OPSO correctional facilities.  He was responsible to insure access and provision of reasonable and adequate health care for persons in custody at the jail.  Further, he was responsible for supervising the development and revision of policies, procedures and protocols concerning the delivery of medical and mental health services at the jail.  He was also responsible for monitoring compliance with all health services policies, procedures, and protocols.  He negotiated and monitored contracts with outside agencies involved in providing health care services to persons in custody of the OPSO.  All matters of medical and mental health judgment are the sole province of the Medical Director.  He was a final policy maker with regard to the provision of medical and psychiatric services to persons in the custody of the OPSO.  He was responsible for the direction, supervision, and discipline of the medical/psychiatric defendants named herein as well as medical/security coordination and training and supervision of correctional employees in health related matters.  He is sued in his individual and official capacities.  He is a person of full age of majority and a resident of the Eastern District of Louisiana.

9.     **DR. MICHAEL HIGGINS**, in his individual and official capacity, is an adult citizen of the State of Louisiana and domiciled in the Eastern District of Louisiana.  **HIGGINS** is the Mental Health Director for OPP and is an employee of the OPSO at all times relevant to this Complaint.  At all pertinent times, he was responsible for the provision of psychiatric services for persons incarcerated in OPP, both directly and as a supervisor.  He was responsible for recommending and hiring qualified mental health care professionals and staff, insuring adequate staffing for the medical needs of inmates, for the supervision, training, discipline, and oversight of personnel and provision of mental health services at OPP correctional facilities, and was responsible to insure access and provision of reasonable and adequate health care for persons in custody at the jail.  He is responsible for supervising the development and revision of policies, procedures, and protocols concerning the delivery of mental services at the jail.  He is also responsible for monitoring compliance with all health services policies, procedures, and protocols.  He negotiates and monitors contracts with outside agencies involved in providing health care services to persons in custody of the OPSO.  All matters of mental health judgment are the province of the Mental Health Director.  He is a final policy maker with regard to the provision of psychiatric services to persons in the custody of the OPSO.  He is responsible for the direction, supervision, and discipline of medical/security coordination and training and supervision of correctional employees in health related matters.  He is sued in his individual and official capacities.

10.     **VINCENT DILEO**, Independent Testamentary Executor for the Succession of Marcus L. DiLeo, is the executor of the estate of **Dr. MARCUS DILEO**, who died in or about May 2014.  Prior to his death, **DILEO** was a medical doctor employed by OPSO, who provided medical services to Mr. Morgan.  At all pertinent times herein, he was responsible for providing

appropriate and adequate medical care to persons in custody of the OPSO, including Mr. Morgan. He was responsible for medical care and treatment of Mr. Morgan as described herein. He had supervisory responsibilities over other medical staff as well as correctional officers and medically trained personnel who had responsibilities related to patient care. He is sued in his individual and official capacity. On information and belief, **VINCENT DILEO** is a person of full age and majority and a resident of the Eastern District of Louisiana.

11. **CHIEF EARL WEAVER,** in his individual and official capacity as an Orleans Parish Sheriff's Deputy, is an adult citizen of the State of Louisiana and domiciled in the Eastern District of Louisiana. Defendant **WEAVER** is the Chief of Security and a high-ranking supervisor at OPSO. At all pertinent times he was responsible for properly supervising and overseeing the job performances of OPSO employees under his supervision. In particular, he was responsible for insuring that employees followed proper procedures with respect to the inmates in their care, custody, and control; and for properly following those procedures himself.

12. **LT. KENT JOHNSON**, in his individual and official capacity as an Orleans Parish Sheriff's Deputy, is an adult citizen of the State of Louisiana and domiciled in the Eastern District of Louisiana. Defendant **JOHNSON** was assigned as a supervisor at the location where Mr. Morgan died. At all pertinent times he was responsible for properly supervising and overseeing the job performances of OPSO employees under his supervision. He was responsible for monitoring and reporting detainees' serious medical conditions to medical staff. He was responsible for checking on Mr. Morgan while Mr. Morgan was in isolation and for ensuring a safe environment for him. He was also responsible for insuring other deputies checked on Mr. Morgan if he could not, and for monitoring any video feeds coming from the isolation cells. He was responsible for training and supervising other deputies at OPP.

13.     **DEPS. ANDERSON, SAMUEL, AND JOHNSON**, in their individual and official capacities as Orleans Parish Sheriff's Deputies, are adult citizens of the State of Louisiana and domiciled in the Eastern District of Louisiana. At all pertinent times, defendants **ANDERSON, SAMUEL, AND JOHNSON** were employed by the OPSO as correctional officers assigned to the location where Mr. Morgan died.  They were responsible for communicating serious medical conditions of detainees like Mr. Morgan to medical staff.  On information and belief, they were also responsible for checking on Mr. Morgan when he was in isolation or for insuring that other deputies did the required checks.

14.     Defendants **K. DAVIS, R. GATES, L. PHIPPS, P. MACKIE, V. GABRIEL, S. WATSON, V. NEWIS,** were each employees of the OPSO, licensed and employed as LPNs and/or RNs, at all pertinent times herein, and were responsible for providing adequate and appropriate nursing care for inmates at OPSO, including Mr. Morgan.  The duties of these nurses included documentation and paperwork necessary for continuity of care of persons in the custody of the OPSO, including assessment and monitoring of the medical and psychiatric condition, health, and safety of Mr. Morgan and providing appropriate and adequate nursing care and assessments for him, with proper documentation of same.   Defendants **DAVIS, GATES, PHIPPS, MACKIE, GABRIEL, WATSON,** and **NEWIS** had the authority and responsibility to monitor and make regular periodic checks of Mr. Morgan's physical and mental status, including the duty to insure that he was in a safe, appropriate environment and that he was receiving appropriate treatment.  They further had the duty to report relevant facts regarding Mr. Morgan's behavior and symptoms to appropriate medical providers.  These defendants are sued in their individual and official capacities.  These defendants are persons of full age of majority, and on information and belief are residents of the Eastern District of Louisiana.

15.      **JOHN DOES #1-6**, individually and in their official capacities as Orleans Parish Sheriff's Deputies, are adult citizens of the State of Louisiana and, on information and belief, are domiciled in the Eastern District of Louisiana.  At all pertinent times, defendants **JOHN DOES #1-6** were employed by the OPSO as correctional officers assigned to the location where Mr. Morgan died. They were responsible for communicating serious medical conditions of detainees like Mr. Morgan to medical staff.  They were also responsible for checking on Mr. Morgan when he was in isolation or for insuring that other deputies did the required checks.

### III.      FACTUAL ALLEGATIONS

16.      On September 16, 2014, Clifton Morgan was arrested for simple burglary of a business.

17.      After his arrest, Mr. Morgan was turned over to the custody of the Orleans Parish Sheriff. Upon his intake to OPP, Mr. Morgan was screened by one of the defendants, **K. DAVIS**. Mr. Morgan reported that he was feeling suicidal.  He also told the intake staff that he had been taking the psychiatric medication Seroquel for three years, and that he had last taken it the day before his admission.   Mr. Morgan also reported that he was being treated for his schizophrenia at Algiers Fisher Behavioral Health Center.

18.      Defendant **K. DAVIS** ignored the manifest signs that Mr. Morgan was at risk for serious bodily harm and needed to be transferred to a hospital immediately for treatment.

19.      In the alternative, defendant **K. DAVIS** failed to exercise due care when medically screening Mr. Morgan, such that she negligently overlooked the signs of the risk that Mr. Morgan would suffer serious bodily harm.  She negligently failed to have him transferred to a hospital.

20.     Mr. Morgan was placed on a suicide watch at the OPSO psychiatric unit.  However, he was not provided any Seroquel, despite his repeated requests for the medication.  Nor was he given any other medication to treat or otherwise address his mental health needs.

21.     The failure of the defendants, particularly defendant **HIGGINS** and the other medical defendants, to provide Mr. Morgan his medications constituted deliberate indifference to Mr. Morgan's serious medical needs.  Furthermore, the failure to provide Mr. Morgan with his medications fell below the applicable standard of care and was negligent.

22.     Mr. Morgan continued to plead for his psychiatric medication while he was incarcerated. He also repeatedly told jail staff including the defendants, and particularly defendant **HIGGINS** and the other medical defendants, that he was feeling suicidal.  The defendants, however, continued to refuse to provide him medications or otherwise give him appropriate and adequate care.

23.     Additionally, the defendant members of the medical and jail staff failed to properly monitor Mr. Morgan during this period.  Although they were required to perform periodic checks on Mr. Morgan, the defendants failed to perform these checks and/or failed to accurately report Mr. Morgan's condition.  The failure of the medical and jail staff defendants to conduct checks and document Mr. Morgan's condition accurately constituted deliberate indifference to his serious medical needs and/or fell below the applicable standard of care and was negligent.

24.     Furthermore, no defendant sought Mr. Morgan's psychiatric records from Algiers Fischer Behavioral Health Center to determine why he was being treated there and the medications he had been prescribed.  The failure of any defendant, but particularly the medical defendants, to request these records constituted deliberate indifference to Mr. Morgan's serious medical needs and/or fell below the applicable standard of care and was negligent.

25.     Deprived of the medicine that had helped to stabilize him for three years prior to his incarceration, Mr. Morgan's behavior became increasingly bizarre.   Approximately eight days after his incarceration, he was found lying on the floor of his cell in a near-catatonic state.   He refused to speak to any jail staff or doctors.   Ultimately, he was routed to the hospital for an evaluation.

26.     Mr. Morgan continued to refuse to speak at the hospital.   After an examination, the hospital released him back to OPP with the direction that he be placed on the psychiatric unit and his condition monitored.

27.     After his return from the hospital, Mr. Morgan was initially placed back on the psychiatric tier.   Shortly thereafter, however, defendant **HIGGINS** ordered him moved directly to general population.

28.     The decision by **HIGGINS** and the other medical defendants to move Mr. Morgan directly from suicide watch on the psychiatric tier to general population was unreasonable and dangerous given the circumstances, especially Mr. Morgan's repeated expressions of his intent to commit suicide during his stay at OPSO, the failure to provide him any psychiatric medications, the failure to obtain his records from Algiers Behavioral Health Center, and his recent hospitalization because of bizarre behavior.   The decision to move him to general population directly from a higher security psychiatric unit, especially without any "step-down" or transitional period, constituted deliberate indifference to Mr. Morgan's serious medical needs and/or fell below the applicable standard of care and was negligent

29.     Mr. Morgan was placed in a multi-person cell in general population.   A short time later, however, he was moved to a holding cell where he was held in isolation.   On information and

belief, defendants **WEAVER** and/or **JOHNSON** directed that Mr. Morgan be placed in isolation.

30. Defendants **WEAVER** and/or **JOHNSON** and/or the other defendants knew, must have known, or should have known of Mr. Morgan's history and risk of serious bodily harm. These defendants also knew, must have known, or should have known that it was against OPSO policy to place a detainee at risk for serious bodily harm in an isolation cell. These defendants intentionally violated OPSO policy by putting Mr. Morgan in isolation. There was no justifiable reason to place Mr. Morgan in isolation and then fail to check on him given his condition and the risk of serious bodily harm. Alternatively, these defendants placed Mr. Morgan in isolation to punish him for some perceived misbehavior. Such use of isolation was unreasonable, dangerous, and against OPSO policy. In the alternative, the OPSO failed to have policies that prevented the unreasonable use of isolation that occurred in this case.

31. The holding cell where Mr. Morgan was placed was not suicide resistant. In fact, there were multiple easily accessible "tie-off" points throughout the cell. "Tie-off" points are known to present a risk that a detainee will use them to commit suicide or other self-harm. The tie-off points in Mr. Morgan's cell included the bars on the cell.

32. Considering Mr. Morgan's recent history, the decision to place him in a non-suicide resistant isolation cell was deliberately indifferent to his serious medical needs and risk of injury. Furthermore, it fell below the applicable standard of care and was reckless and/or grossly negligent.

33. On information and belief, the policies and procedures at OPSO require a deputy to personally check on anyone locked in an isolation cell at least once every fifteen minutes.

Additionally, and in the alternative, the policies and procedures at the OPSO are inadequate to insure the safety of detainees locked in isolation cells.

34. On information and belief, the policies and procedures at OPSO require that a member of the medical staff personally check on anyone locked in an isolation cell once every thirty minutes. Additionally, and in the alternative, the policies and procedures at the OPSO are inadequate to insure the safety of detainees locked in isolation cells.

35. There is a pattern and practice at OPSO of failing to adhere to what policies and procedures do exist. There is also a pattern and practice of failing to monitor, supervise, and discipline for OPSO deputies' failure to follow policies and procedures.

36. On information and belief, it is against OPSO policy to place someone who is at risk of serious bodily harm, including suicide, in an isolation cell. There is, however, a pattern and practice of placing detainees at risk for serious bodily harm in isolation, and then failing to check on them as required to insure their well-being and safety.

37. While he was in the holding cell, the defendants did nothing to monitor Mr. Morgan to insure that he did not harm himself. The failure to conduct periodic checks as required was deliberately indifferent to Mr. Morgan's serious medical needs and/or fell below the applicable standard of care and was negligent.

38. Shortly after midnight on September 28, 2013, Mr. Morgan was found hanging from the bars of the holding cell. On information and belief, he had used his jail-issued jumper to fashion a ligature around his neck. A short while later, Mr. Morgan was declared dead.

39. The defendants knew, must have known, or should have known that OPP had a history of serious injuries and deaths of prisoners due to the lack of adequate medical and correctional treatment and care of prisoners suffering from acute mental health crises and suicidal ideation.

As with Mr. Morgan, OPSO staff failed to take appropriate or necessary action with regard to these prisoners, resulting in their deaths, serious injuries and/or suffering, as described below:

1. On March 27, 1995, in the case entitled *William P. DeMouy, Sr., v Foti*, Docket No. 94-423, the prisoner survived but judgment was entered against then-Orleans Parish Criminal Sheriff Charles C. Foti, Jr. and a deputy for improper monitoring and inadequate care of a suicidal prisoner placed in 5-point restraints on the psych floor of OPSO.

2. On Nov. 29, 1996, Regie S. Hargrove, an inmate who was supposedly being monitored for suicide, hanged himself with a bed sheet in a cell which was out of the line of vision of the nurses and deputies stations and which had numerous "tie-off" points. Mr. Hargrove had also been the subject of improper use of restraints and inadequate monitoring and care while in restraints.

3. On August 10, 2001, Shawn Duncan Sr., an arrestee charged with operating while intoxicated, reckless driving, and other traffic offenses, who was alleged to have suicidal/homicidal ideation, died of dehydration after having been in 5-point restraints for 42 hours and given inadequate food, water and medical care to sustain life.

4. On April 3, 2004, Matthew Bonnette, a young man who was arrested after a car accident, professed suicidal ideation, was placed in 4-point restraints and was on "suicide watch." On April 4, 2004, while in 4-point restraints, Mr. Bonnette hanged himself at OPP, using the 5-point restraint belt which had been left in his cell, after deputies failed to consistently monitor him.

5. On August 29, 2007, Julio Sortes hanged himself with a telephone cord in his cell. There is no evidence that he was referred for a psychiatric assessment or treated for his illness.

6. On October 3, 2008, Louis Prince was found dead in his cell at OPP. Mr. Prince had been arrested in New Orleans on September 26, 2008 and had been held on the sixth floor of HOD. Even after reports of escalating bizarre behavior, Mr. Prince was never placed on suicide watch, and he ultimately hanged himself in his cell on October 3, 2008.

7. On January 5, 2009, Cayne Miceli, a 43-year-old woman with a history of asthma, panic attacks and depression, died in her cell as a result of being tied down in 5-point restraints for over four hours and being denied medication and appropriate treatment.

8. On or about July 18, 2010, Jose Nelson Reyes Zelaya committed suicide at OPP.

9. On or about June 8, 2011, Louis Alvarez, an ICE (Immigration) detainee, committed suicide at OPP.

10. On August 7, 2011, Commander William Goetzee, a 48-year-old federal career civilian employee of the U.S. Coast Guard and active member and Commander of the U.S. Coast Guard Reserves, committed suicide by ingesting toilet paper and water while on "suicide watch." Mr. Goetzee had been arrested during a suicide attempt in which he attempted to grab the gun of a federal protective officer 5 days earlier. Mr. Goetzee was denied anti-anxiety medication during his entire stay at the jail, despite being temporarily transferred to University Hospital, where such medication was prescribed due in part to Mr. Goetzee's suicidal ideation.

11. On February 7, 2013, Ricky Russell was being housed in protective custody when he was found dead in his cell. Mr. Russell had ingested excessive amounts of mental health medication, and toilet paper was also found in his throat. The Coroner ruled Mr. Russell's death a suicide.

40.     The deliberate indifference of defendants to the serious medical needs of prisoners at OPP is also reflected in the failure of defendants to provide adequate medical and correctional care of arrestees at intake, including inadequate screening, assessment, monitoring and treatment. The failure of defendants to provide adequate medical treatment during the intake process resulted in serious injury and death in the following incidents:

1. On January 12, 2009, John Sanchez was found dead in an isolation cell after being booked into OPP in an extremely intoxicated state. Despite the potential for fatal medical complications associated with alcohol withdrawal, Mr. Sanchez was inadequately monitored, diagnosed or treated.

2. On February 6, 2009, Richard Rowzee was not adequately assessed when he entered the jail and was booked into the jail despite significant medical problems in part related to alcohol withdrawal. Deputies reported to the medical department that he was attempting to kill himself and was beating himself against the wall. By the time the medical department intervened, Mr. Rowzee had given himself a black eye. Ultimately, Mr. Rowzee was routed to

University, where he died, because of potential brain injury and complications from delirium tremens.

3. On April 16, 2010, 32-year-old Michael Hitzman was in the Intake and Processing Center, being booked, when he informed OPSO staff that he had ingested drugs. He was treated with charcoal and placed in isolation where he was not properly monitored and hanged himself.

41. At the time of the admission and retention of Clifton Morgan in OPP, the defendants knew, must have known or should have known of serious deficiencies in the policies, practices and procedures at the jail related to medical and psychiatric screening, care and observation of prisoners who were in need of mental health care and those being monitored for suicide prevention. Defendants were also well aware of the inadequate staffing and inadequate training and supervision of medical and correctional staff with regard to medical and psychiatric problems of prisoners. Despite their knowledge of these serious deficiencies, the defendants failed to take appropriate actions to make necessary changes to policies, procedures, training, supervision or staffing or to intervene to see that Mr. Morgan and others in their custody were provided with adequate care and treatment for serious medical needs.

42. On information and belief, defendants herein have been involved in other incidents involving inadequate care and treatment for prisoners with serious medical needs, which resulted in serious harm, injury, suffering and/or death to inmates in their care. Yet few of these defendants and/or other OPSO staff who were similarly derelict in their duties, were appropriately disciplined or held accountable for their acts or omissions. In addition, those responsible for training and supervising OPSO staff who have failed in their own responsibilities to provide adequate care to prisoners, have not themselves been subject to disciplinary action or accountability for failing their supervisory and/or training responsibilities.

43.     Defendant **GUSMAN**, Orleans Parish Sheriff, at all relevant times herein knew, must have known, or should have known of these serious deficiencies yet failed to take necessary or appropriate actions to address and correct them.

44.     On October 10, 2008, a report was submitted to defendant Sheriff Marlin **GUSMAN** entitled "An Operational Review of the Orleans Parish Jail" funded by the National Institute of Corrections (NIC). This report documented significant, pervasive and serious problems at the jail relating to the lack of adequate and trained staff, the poor quality of the physical facilities, and poor staff-inmate relations. The report also found "the mental health program in the jails is dramatically understaffed and the program is much too limited in scope." The NIC report further concluded that the jail lacked adequate therapeutic services for mentally ill prisoners. The report recommended that prisoners who are "deemed actively suicidal should be refused intake, and the police should transport them directly to Charity Hospital, per policy."  On information and belief, Sheriff Gusman receives reports regarding each suicide that occurs in the jail and knew, must have known, or should have known, of the number and problematic circumstances of suicides at the jail even after the NIC report.

45.     On September 11, 2009, the U.S. Department of Justice, Civil Rights Division, issued a "findings letter" addressed to defendant Sheriff Marlin **GUSMAN** regarding the Orleans Parish Prison system. The Department of Justice, after conducting an investigation for approximately 18 months, found that "OPP fails to provide inmates with adequate mental health care that complies with constitutional standards." The Department of Justice found that the following deficiencies existed:

        a. Inadequate suicide prevention;

b. Inadequate intake and referral process;

c. Inadequate staffing;

d. Inadequate assessment and treatment; and

e. Inadequate quality assurance review.

46.     In addition, the Department of Justice findings letter of September 11, 2009 found that "suicide prevention practices" at OPP were grossly inadequate. The Department of Justice found that the OPP suicide prevention policy requiring direct observation by staff practices deviated from generally accepted standards and that the actual practice deviated from the stated policy. The Department of Justice also found that there was "an alarmingly high number of inmates with mental health issues, including past mental health treatment, history of suicidal behavior attempts and/or being on psychotropic medications, who consistently were not referred to mental health service providers at Intake." The Department of Justice noted that "inmates who were not timely referred remained untreated and have suffered from a worsening of their symptoms, including suicidal and homicidal ideation."

47.     The Department of Justice September 11, 2009 findings letter also stated that "OPP fails to employ sufficient mental health staff to insure that inmates receive adequate services." In addition, the report found that "OPP fails to appropriately and timely assess and treat inmates with mental illness." The Department of Justice also found that the failure of OPP to have multi-disciplinary treatment teams contributed to the failure of the mental health program to meet generally accepted professional standards. In addition, the DOJ investigation revealed a "lack of attention to past mental health information and a failure to provide timely psychiatric assessment and treatment. These failures are inconsistent with generally accepted professional standards and resulted in mental health deterioration and unnecessary suffering."

48.     The Department of Justice September 11, 2009 findings letter also found that "OPP fails to engage in consistent, effective quality assurance review in order to monitor and assess the quality of mental health offered at the facility."

49.     The defendants were aware of these findings by the National Institute of Corrections and the Department of Justice. However, the defendants, and in particular defendants **GUSMAN**, **GORE**, **HIGGINS**, and **DILEO** failed to take necessary and appropriate actions to address these issues or to insure that the mental health services at the Orleans Parish jail conformed with community standards and constitutional standards.

50.     On April 23, 2012, the Department of Justice issued a second findings letter, based on an on-going investigation of OPP.   This letter documented continued serious constitutional violations and policies and practices that violated generally accepted standards of care with regard to the provision of medical and mental health services at the Orleans Parish Prison.

51.     In the April 23, 2012 letter, the Department of Justice found that "suicide prevention measures at OPP are grossly inadequate, resulting in unnecessary suffering, and very likely leading to at least five suicides since our findings letter in 2009. The jail has inadequate mechanisms to identify suicidal prisoners, inadequate treatment and staffing and poor training of officers." The Department of Justice found that prisoners at OPP identified as being at risk of self-harm were subjected to inhumane treatment.

52.     In its April 23, 2012 letter, the Department of Justice found that "the Orleans Parish Prison is deliberately indifferent to prisoners with serious medical and mental health needs. The jail has inadequate mechanisms to identify prisoners with mental illness and too few treatment staff to address urgent and chronic conditions." The Department of Justice also found that as a

result of the policies and practices of the Orleans Parish Prison, prisoners suffered during their incarceration and were returned to the community, in far too many cases, sicker and less equipped to avoid future involvement with the criminal justice system than when they entered.

53. The findings of the Department of Justice in April 2012, were consistent with the findings in September 2009, that the operations of the Orleans Parish jail were deliberately indifferent to the risk of serious harm to prisoners who were seriously mentally ill and suicidal. The Department of Justice findings letters of April 23, 2012, found that in two of the five completed suicides which had occurred since 2009, "deficient monitoring contributed to the prisoners' suicides."

54. The Department of Justice also found, in the April 23, 2012 findings letter, that "once prisoners were placed on suicide watch, the mental health evaluations were cursory and rarely addressed suicide risk issues." The findings letter also concluded that "prisoners did not receive meaningful treatment, aside from being medicated and monitored."

55. The Department of Justice findings letter of April 23, 2012 found that "OPP fails to adequately monitor its prisoners on suicide watch." The Department of Justice observed and found clear violations of the defendants' own policies with regard to direct observation of prisoners on suicide watch.

56. The conclusion of the Department of Justice in April, 2012, after having investigated the OPP facility over a three-year period, was that OPSO continued to lack the appropriate staffing structure to provide constitutionally adequate mental health care. "OPP's mental health services continue to be deficient in the following areas: (1) evaluation and screening; (2) staffing; (3) assessment and treatment; (4) treatment planning; and (5) quality assurance review. These

deficient OPP practices cause prisoners serious harm and create an unreasonable risk of harm."

57. Defendants **GUSMAN**, **GORE**, **HIGGINS**, **DILEO**, and **WEAVER** knew, must have known or should have known of these deficient conditions, yet they failed to take adequate steps to insure that appropriate and necessary changes in policies, procedures, staffing, training and/or facilities were taken in order to provide adequate care to suicidal and mentally ill patients. These defendants also failed to insure that appropriate supervision and disciplinary action was taken in situations where prisoners suffered or died as the result of inadequate or inappropriate care or treatment by OPSO staff.

58. The defendants knew, must have known or should have known of the dangers and obvious risk of serious harm to mentally ill and suicidal prisoners at OPP because of inadequate and improper monitoring and care of patients experiencing an acute mental health crisis and on suicide precautions, yet failed to take appropriate and necessary steps to insure that reasonable and adequate care was provided. On information and belief, other than the discipline of deputy William Thompson after the death of Mr. William Goetzee, none of the individuals responsible for the care and safety of Clifton Morgan, Shawn Duncan, Regie Hargrove, William DeMouy, Sr., Matthew Bonnette, Louis Prince, Julio Sotres, Cayne Miceli, Richard Rowzee, John Sanchez, Michael Hitzman, Jose Nelson Reyes Zelaya, Ricky Russell, or any other suicidal prisoners at OPSO who received inadequate, improper or harmful treatment, were disciplined or held accountable for their acts or omissions. The defendants ratified or condoned acts or omissions by OPSO staff which caused serious harm, suffering and death to prisoners at OPP, and maintained a custom and practice whereby there was no accountability for OPP staff who mistreated prisoners or who violated policies, procedures or standards of care for prisoners in need of adequate care for serious medical needs. The defendants' actions and failures to act

were a direct and motivating force that caused the death of Mr. Morgan on September 28, 2013.

59.     In addition to the reports from the National Institute of Corrections and the Department of Justice, the defendants were aware of the deficiencies in the physical facilities through the monitoring and oversight of the psychiatric department of the Orleans Parish jail from 1992 through 2008, by the federal court in the proceedings entitled *Hamilton v. Morial*, No. 69-2443. Defendants **GUSMAN**, **GORE**, and **HIGGINS** were aware, prior to Clifton Morgan's death, that the physical facilities in which severely mentally ill and suicidal prisoners were being held were inadequate, dangerous, and un-safe, and posed an obvious risk of serious harm to prisoners held there. They were aware that the cells for confinement of inmates who were suicidal did not meet acceptable or community standards of care, that the conditions in which the suicidal prisoners were being held were inhumane and anti-therapeutic and that these conditions presented an obvious risk of serious harm to mentally ill and suicidal prisoners. Yet defendants continued to accept and house prisoners, such as Mr. Morgan, whose serious medical needs could not be met under these conditions and in fact, whose mental and medical condition would deteriorate if confined at OPP.

60.     Although the NIC report, the DOJ findings letters, and the proceedings in *Hamilton v. Morial* had previously alerted the defendants to the serious inadequacies regarding mental health and suicide prevention at OPP, the defendants received additional notice in the form of extensive litigation in the case of *Jones v. Gusman*, Docket No. 12-859, months before Mr. Morgan's death. The filings and proceedings during that litigation include multiple reports by mental health and psychiatry experts, a consent judgment signed by Defendant **GUSMAN**, testimony at a three-day Fairness Hearing, and, finally, Judge Africk's lengthy and detailed order approving the consent judgment.

61.     Judge Africk signed his order approving the consent judgment signed by Defendant **GUSMAN** governing the operations of OPP on June 6, 2013, approximately three months before Mr. Morgan's death. The judgment included a wide range or provisions governing mental heath and suicide prevention at OPP that are designed to ensure that "mental health services at OPP comply with the Constitution."

62.     The requirements of the consent judgment include the development of "an appropriate screening instrument that identifies mental health needs, and ensures timely access to a mental health professional when presenting symptoms require such care," and the screening of all prisoners "upon arrival to OPP, but no later than within eight hours, to identify a prisoner's risk for suicide or self-injurious behavior." The consent judgment further requires that "a Qualified Mental Health Professional performs a mental health assessment no later than the next working day following any adverse triggering event (i.e. any suicide attempt, any suicide ideation, or any aggression to self resulting in serious injury)," and the "adequate and timely treatment for prisoners, whose assessments reveal mental illness and/or suicidal ideation, including timely and appropriate referrals for specialty care and visits with Qualified Mental Health Professionals, as clinically appropriate."

63.     The consent judgment further requires OPSO to provide "a continuum of services" and "a treatment plan for prisoners with serious mental illness," which should "adequately address prisoners' serious mental health needs" and should be "specifically tailored to the prisoner's diagnoses and problems." Under the consent judgment, OPSO must "[e]nsure that prisoners receive psychotropic medications in a timely manner and that prisoners have proper diagnoses and/or indications for each psychotropic medication they receive."

64.     The consent judgment also includes a series of provisions governing suicide precautions at OPP, including the identification, protection, and treatment of prisoners at risk of self-harm, and specifically requiring "constant direct supervision of current suicidal prisoners and close supervision of special needs prisoners with lower levels of risk (at a minimum, 15 minute checks)." The judgment further requires the implementation of "a step-down program providing clinically appropriate transition for prisoners discharged from suicide precautions." The consent judgment requires that suicidal prisoners be housed in cells that are "suicide resistant," and receive an "individualized clinical determination of allowable clothing, property, and utensils."

65.     The consent judgment further requires the development and implementation of "a risk management system that identifies levels of risk for suicide and self-injurious behavior and requires intervention at the individual and system levels to prevent or minimize harm to prisoners," a system that should have been in place at the time of Mr. Morgan's death.

66.     In his 104-page order approving the consent judgment in *Jones v. Gusman*, Judge Africk outlined a number of "stark, sometimes shocking, deficiencies in OPP's medical and mental health care system." The judge summarized his findings related to mental health provision at OPP by concluding that "[t]he evidence presented shows that a lack of treatment altogether, rather than inadequate treatment, contributes to severe deficiencies in medical and mental health care at OPP." He noted that "'[a] prison that deprives inmates of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society.'" The judge specifically found that "[t]he consent judgment provisions on mental and medical health care are necessary to remedy the violation of federal rights, and they are the least intrusive means of doing so."

67.     Judge Africk found that "mental health units, including those designed for suicide monitoring, were patently not suicide proof." The judge further noted that "[a]t intake, prisoners with clear histories of self-harm, mental illness, or potential withdrawal from prescribed or illicitly acquired substances are cleared for placement in the general population without any medical or mental health consultation."

68.     Judge Africk also noted the conclusion of Dr. Bruce Gage, Chief of Psychiatry for the Washington State Department of Corrections and a Department of Justice expert in the case, that "in several cases, including instances of inmate suicide, an initial referral to psychiatry could have changed the outcome of the cases." Further supporting the judge's conclusions about the care at the jail, Judge Africk quoted Dr. Gage's finding that "[t]here was not one example of a thorough psychiatric assessment by the OPP psychiatrist in any of the records [provided by OPSO] and most were not even minimally adequate." Judge Africk noted that "[n]one of the records included an assessment of suicide risk, rather, 'this potion of the assessment consisted in simply noting whether the person expressed suicidal ideation or not.'"

69.     Judge Africk reiterated Dr. Gage's previous testimony that

    I've seen a number of jails and I have not seen conditions as deplorable as I have seen in this jail, and I have not seen such absence of mental health services in the context of just abysmal physical environments and the kind of failure to monitor people and so on that I was speaking about. It was just more dramatic than I have ever seen in any other institution.

70.     Judge Africk described the stories of multiple prisoners who reported suicidal ideation while at OPP and who were never properly treated, some of whom died as a result of their lack of treatment. The judge specifically found that "[i]t is egregious that [one such prisoner] died after *announcing* his passive suicidality" (emphasis in original).

71.     Judge Africk further noted that "psychotropic medications are frequently discontinued at OPP." He observed that psychotropic medications are stopped at intake "approximately 75-80% of the time, with some OPP treatment providers refusing to order them in any circumstance." As Judge Africk explained in his order, "the wholesale discontinuation of all medications creates a risk that inmates will deteriorate psychiatrically, develop a discontinuation syndrome, or experience withdrawal, all of which can cause unnecessary pain and suffering. Moreover, the abrupt discontinuation of psychotropic medication can increase the likelihood of suicide and assault and worsen inmates' long-term prognosis."

72.     Judge Africk further found that "OPP does not provide appropriate treatment to mentally ill inmates, even when they pose a danger to themselves and others." The judge described the observations made by Dr. Gage of one inmate who was "'simply allowed to languish in psychosis, untreated,' despite the fact that evidence of psychosis was documented in [the prisoner's] record by other physicians." The judge further noted that the prisoner had previously submitted a sick call request specifically requesting the psychotropic medications he had been prescribed while housed at his previous facility.

73.     Judge Africk also made findings related to the "dramatically insufficient staffing" of mental and medical health care providers. The judge noted the conclusion of Dr. Daphne Glindmeyer, an expert in mental health and psychiatry and a consent judgment compliance monitor with respect to mental health care at a number of juvenile correctional facilities, that "OPP's mental health staffing is 'woefully inadequate.'" The judge noted that the ratio of nurses to prisoners makes it "impossible for the nurses to adequately evaluate and chart patients, administer medications, respond to emergencies, provide suicide monitoring, gather sick call information, and provide basic nursing services."

74. Judge Africk also made a number of findings related to the inadequate suicide prevention protocols, policies, and practices at OPP. The judge found that the evidence in the record supported Dr. Gage's characterization that most of the OPP staff exhibit "'a level of disregard and disrespect towards the mentally and chemically dependent' that is made plain by the conditions on the residential mental health unit and 'especially the approach to suicide monitoring.'" The judge further noted the complete lack of "suicide proof cells" within OPP's facilities. He noted that on the suicide watch tier, "significant self-harm events were not listed as 'sentinel events' that would trigger staff review," including "countless episodes of tying cloth around necks, sometimes anchored to objects[,]" and that "[i]nmates who commit suicide are sometimes not discovered for quite some time." Judge Africk specifically noted that "suicide is a leading cause of death in correctional settings, and approximately 95% of suicides in jails and prisons are committed by hanging."

75. Judge Africk made additional findings related to the generating and keeping of records at OPP. He noted that "[i]n numerous instances, inmates are sent to the emergency room, but there is no indication in the inmates' medical records regarding the outcome of their visits." As the judge found, "[t]he "serious deficiencies in record keeping make it difficult to comprehensively assess the quality of care at OPP and to render emergency care to inmates."

76. The reports of Dr. Gage and Dr. Glindmeyer provided additional notice to the defendants about the significant mental health and suicide prevention inadequacies at OPP. In his March 3, 2013 report, Dr. Gage found "a general pattern of reckless and callous disregard for the suffering and treatment needs of the mentally ill and chemically dependent in OPP." He noted that the conditions at OPP "are indicative of a general indifference to the welfare of the mentally ill prisoners at OPP," and "a level of disregard and disrespect on the part of most staff towards the

mentally and chemically dependent that is patently non-therapeutic." He described "a general pattern of overall system failure that ramifies broadly through OPP," which "is apparent in the inadequate care of the mentally ill and chemically dependent." He found that, "in essence, the mentally ill are punished for being mentally ill."

77.     Dr. Gage found that "OPP fails to meet minimal standards of care in terms of access to care; initial screenings; mental health assessment; emergency care; urgent care; referral by staff; sick call; [] routine mental health treatment (including provision of psychotropic medications and basic therapy); [ . . . and] suicide detection, assessment, and prevention." He further found that "[t]raining in suicide, mental health, and chemical dependency is inadequate for both health service and correctional staff." He noted that all of these inadequacies have led "to a variety of demonstrable and repeated harms."

78.     In his report, Dr. Gage outlined in great detail the "seriously inadequate" mental health staffing at OPP, and specifically outlined the number and kinds of staff members that would need to be added to the existing staff in order to comply with minimum standards. He found that "[s]taffing is insufficient to allow practitioners to meet the standard of care." Dr. Gage further noted that "there is a lack of concern about the problems and, consequently, little effort to improve care or conditions," and that the lack of effort exhibited by staff during his site visit "demonstrates the extent to which OPP staff are indifferent."

79.     Dr. Gage also noted the lack of monitoring, observing that "[t]here are several examples throughout this report of prisoners who, had they been more closely monitored, might well be alive today." Dr. Gage found "clear evidence that corners are cut with regard to monitoring," which in his opinion "is directly attributable to lack of staff." Dr. Gage further noted that "in

many of the death cases, the prisoner was not quickly discovered, providing further evidence of inadequate general monitoring of the prison population."

80.     In his report, Dr. Gage further noted that "there were very few charts where there were any outside records, including in cases where prisoners were known to be receiving outside treatment. There are numerous instances where prisoners are sent to the emergency room where there is nothing in the chart indicating the outcome of the emergency room visit, neither a receiving note by OPP staff nor records from the emergency room providers themselves."

81.     Dr. Gage specifically noted that at various points during the period he studied, psychotropic medications were ordered for 10% to less than 15% of the population of the jail, which is "the low end of what is expected for jail settings where conservative estimates from the literature demonstrate the prevalence of serious mental illness to be 15-25%, and that OPP "routinely stops psychotropic medications on admission . . . with its own attendant risks." Dr. Gage further noted that "outside of psychotropic medications there is no evidence of any active or organized treatment" of prisoners housed on the mental health units.

82.     Dr. Gage explained in his report how OPP's inadequate screening process contributes to the deficiencies in mental health care and suicide prevention at the jail: "Intake assessment is done in a wide open public space in full sight of numerous offenders and OPP staff with only token attention to private communication of confidential medical information." His reviews of documents generated during screening found that the information they contained was "frequently inaccurate," and that the inaccuracies "included serious problems such as indicating that the prisoner had no . . . mental illness, and erroneous medical information."

83.     Dr. Gage's report also included extensive findings related to suicide detection,

assessment, and prevention at OPP. Dr. Gage found that "prisoner after prisoner reported that their psychiatric contacts were extremely brief; most commented they were less than five minutes, and almost all reported that the psychiatrist asked them only whether they had thoughts of harming themselves or others and then refused to speak with them any longer."

84.     Dr. Gage's findings are supported by those of Dr. Daphne Glindmeyer in her March 2, 2013 report on the state of mental health and psychiatric treatment at OPP. Dr. Glindmeyer found that even when a prisoner's use of prescription or psychotropic medications was noted on the initial screening questionnaire, "prison staff rarely continued medications unless the individual actually brought in the prescription medication." She noted that abrupt discontinuation of psychotropic medications is "of particular concern" because it can lead to "rapid decompensation resulting from re-emergence of psychiatric symptoms" and other serious effects. Like Dr. Gage, Dr. Gindemeyer also noted there is "an absence of other therapeutic modalities outside of psychotropic medication" at OPP, and "a complete absence of mental health interventions outside of psychotropic medications."

85.     Dr. Glindmeyer's findings are entirely unambivalent as to the inadequacy of care at OPP. As she wrote in her report, "[a]ccess to health care at OPP must be improved. It is inappropriate for incarcerated individuals to request health care from security staff who may either purposefully or unintentionally impede or delay the individual's receipt of health care."

86.     Noting the "woefully inadequate" psychiatric and mental health staffing at OPP, Dr. Glindmeyer found that these few employees (one psychiatrist at 40 hours per week and one social worker at 40 hours per week) "would be unable to perform even basic assessments to a level of acceptable quality."

87.     In reviewing OPP's "Suicide Prevention Program" policy and procedure, Dr. Glindmeyer found that "the policy was lacking specific detail across most areas outlining protocol for suicide prevention and response. She further found that the suicide prevention training provided by Defendant **HIGGINS** "was generally lacking in detail required by OPP policy[.]" She noted that the training included "no discussion of documentation, communication, assessment, recognition of suicidal inmates, supervision and handling of inmates, or interventions to be used if an individual is discovered following a suicide attempt." The information the training did include "did not equip staff or personnel with skills or interventions that could be translated to everyday use in order to more effectively identify suicide risk, manage suicidal individuals, or respond effectively to suicidal behavior/attempts." She specifically noted that the training minimized suicidal gestures by referring to them as "'a cry for help' or 'manipulation.'"

88.     Defendants knew, must have known, or should have known, that the standard of care for suicidal patients and those experiencing acute mental health crises could not be met by the policies, procedures, staffing or physical facilities of the OPSO but failed to order or to take appropriate steps to see that Mr. Morgan or other prisoners in similar situations received appropriate and adequate care in accordance with community standards of care.

89.     On information and belief, there are other instances where prisoners who were mentally ill and suicidal suffered harm due to inadequate medical care and monitoring by the defendants and other OPSO staff, yet there was little or no accountability, consequence or discipline imposed on said staff.

90.     Defendants **GUSMAN**, **GORE**, **HIGGINS**, and **DILEO** knew, must have known, or should have known that the policies and procedures of the jail for providing medical services and

treatment of psychiatric patients, including the suicide prevention and "suicide watch" procedures, facilities and staff, were seriously deficient and inadequate and posed a serious risk of harm to the serious medical and psychiatric needs of prisoners so confined, yet they failed to take appropriate or necessary steps to correct them.

91.     The defendants **GUSMAN**, **GORE**, **HIGGINS**, **DILEO,** and **WEAVER** knew, must have known, or should have known of the serious inadequacies of the policies, procedures, customs, and practices at OPSO relating to prisoners who were suicidal, and had the obligation and ability to correct these deficiencies but failed to do so.

92.     Defendant **GUSMAN** is ultimately responsible for hiring, training, supervising, disciplining and/or retaining all employees at the OPSO.  He is responsible for each and every other defendant named herein.

93.     Defendant **GORE** is ultimately responsible for hiring, training, supervising, disciplining and/or retaining defendants **HIGGINS, DILEO, and the other medical staff named as defendants herein**.  He is further responsible for policies, procedures, and customs of the medical personnel of the OPSO.

94.     Defendant **HIGGINS** had the responsibility and duty for the diagnosis, oversight, review, monitoring, supervision, and evaluation of Mr. Morgan's medical needs (including psychiatric needs), the delivery of care for him, and the policies and procedures governing his treatment. Defendant **HIGGINS'S** actions with respect to the care of Mr. Morgan exhibited deliberate indifference to Mr. Morgan's serious medical needs.  Furthermore, and in the alternative, **HIGGINS'S** care of Mr. Morgan fell below the applicable standard of care and was negligent.

95.     Defendant **DILEO** had the responsibility and duty for the diagnosis, oversight, review, monitoring, supervision, and evaluation of Mr. Morgan's medical needs, the delivery of care for

him, the policies and procedures governing his treatment, and supervision of the medical staff, correctional officers, and medically trained personnel tasked with caring for Mr. Morgan. Defendant **DILEO'S** actions with respect to the care of Mr. Morgan exhibited deliberate indifference to Mr. Morgan's serious medical needs. Furthermore, and in the alternative, **DILEO'S** care of Mr. Morgan fell below the applicable standard of care and was negligent.

96. Defendant **WEAVER** had the responsibility and duty to properly supervise and oversee the job performances of OPSO employees under his supervision who were tasked with caring for Mr. Morgan. In particular, he was responsible for insuring that employees followed proper procedures with respect to the inmates in their care, custody, and control; and for properly following those procedures himself. Defendant **WEAVER'S** actions with respect to the care of Mr. Morgan exhibited deliberate indifference to Mr. Morgan's condition. Furthermore, and in the alternative, **WEAVER'S** care of Mr. Morgan fell below the applicable standard of care and was negligent.

97. Defendants **DAVIS, GATES, PHIPPS, MACKIE, GABRIEL, WATSON,** and **NEWIS** were responsible for providing adequate and appropriate nursing care for Mr. Morgan. They were responsible for the documentation and paperwork necessary for continuity of care of Mr. Morgan, including assessment and monitoring of the medical and psychiatric condition, health, and safety of Mr. Morgan and providing appropriate and adequate nursing care and assessments for him, with proper documentation of same. Defendants **DAVIS, GATES, PHIPPS, MACKIE, GABRIEL, WATSON,** and **NEWIS** failed in their responsibility to monitor and make regular periodic checks of Mr. Morgan's physical and mental status, including the duty to insure that he was in a safe, appropriate environment, that he was receiving appropriate treatment, and to report relevant facts regarding Mr. Morgan's behavior and

symptoms to appropriate medical providers. These defendants' actions with respect to the care of Mr. Morgan exhibited deliberate indifference to Mr. Morgan's serious medical needs. Furthermore, and in the alternative, these defendants' care of Mr. Morgan fell below the applicable standard of care and was negligent.

98.    Defendants **ANDERSON, SAMUEL, JOHNSON, and JOHN DOES #1-6** are each persons who had the responsibility and duty to monitor Mr. Morgan while he was being held in the isolation cell, to communicate any problems to the appropriate personnel, and to intervene if necessary to assist him. Each of these defendants failed in their duty to him, exhibiting deliberate indifference and/or negligence.

99.    The failures of the above-described defendants to comply with their duties and their breach of the applicable standards of care with respect to Mr. Morgan while he was in their care resulted in his death.

100.    Policy making defendants, including **GUSMAN, GORE, HIGGINS, DILEO,** and **WEAVER** knew that the policies, practices, and procedures with respect to suicide prevention at OPSO were inadequate and posed a danger of serious bodily harm to detainees at OPP. However, they took no action to correct these policies, practices, and procedures. Their failure to do so ratified and condoned these practices. Their inaction with respect to these policies, practices, and procedures was motivated by deliberate indifference and/or culpable negligence to the serious risks to detainees.

101.    Clifton Morgan's risk of serious harm and/or death was known, obvious and must have been known, and/or should have been known to all defendants named herein. All defendants failed to take appropriate action and necessary measures to protect and preserve Mr. Morgan's life and safety, as set forth herein. All defendants' actions as described herein were taken with

deliberate indifference to Mr. Morgan's risk of serious bodily harm and/or failed to meet the applicable standard of care and were negligent.

## IV.    FIRST CAUSE OF ACTION

102.    Plaintiff repeats and re-alleges each and every allegation of this Complaint.

103.    The defendants, acting individually and together, and under color of law, engaged in a course of conduct and conspired to engage in a course of conduct that acted to deprive Clifton Morgan of his constitutional rights and did deprive him of said rights, specifically, the right of Clifton Morgan to reasonable and adequate medical care, the right to be free from cruel and unusual punishment, the right to be free from unreasonable searches and seizures, and the right to due process and equal protection of the laws as protected by the First, Fourth, Eighth, and Fourteenth Amendments and Article IV (Privileges and Immunities Clause) of the United States Constitution and 42 U.S.C. § 1983.

104.    At all times pertinent herein, the defendants, acting individually and collectively, acted unreasonably, recklessly, and with deliberate indifference and disregard for the constitutional and civil rights and life and serious medical needs of the deceased, Clifton Morgan.

105.    The defendants' actions were reckless, willful, wanton, and/or malicious.

106.    Defendants, individually and collectively, had the duty and ability to intervene to prevent the violations of the rights of Clifton Morgan, deceased, described herein, but failed to do so.

107.    Plaintiff further alleges that such acts as alleged herein were the proximate cause and cause in fact of the injuries sustained and the death of Clifton Morgan and the damages incurred thereby.

## V.    SECOND CAUSE OF ACTION

108.    Plaintiff repeats and re-alleges each and every allegation of the Complaint.

109. Defendants **GUSMAN, GORE, HIGGINS, WEAVER,** and **DILEO**, acting individually and collectively, established, condoned, ratified, and encouraged customs, policies, patterns, and practices that directly and proximately caused the deprivation of the civil and constitutional rights of the deceased, as alleged herein, and the damages and injuries described herein, in violation of the First, Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. 1983. They did so with deliberate indifference to the rights of detainees at OPSO facilities.

110. These written and unwritten policies, customs, patterns and practices included:

1. Inadequate, improper, and unreasonable screening, treatment, monitoring and supervision of the serious medical and psychiatric needs of persons in custody;

2. Inadequate, improper, and unreasonable screening procedures for risks of serious harm occurring to detainees;

3. Inadequate and unreasonable sick call, referral, and follow-up procedures relative to the serious medical and psychiatric needs of persons in custody;

4. The improper use of isolation cells for detainees, including using the isolations cells to hold detainees at risk for serious bodily harm;

5. The failure to properly monitor detainees who are locked into isolation cells, both by in-person checks and video surveillance;

6. Inadequate and unreasonable on-site medical and psychiatric staffing and coverage;

7. Hiring of inadequately trained and inexperienced persons to screen and monitor persons in the custody of OPSO;

8.      Hiring of inadequately trained persons to render medical and psychiatric treatment to persons in custody;

9.      Inadequate training, supervision, and discipline of medical personnel responsible for screening, diagnosis, and treatment of medical conditions at OPP;

10.     Inadequate hiring, training, supervision, and discipline of deputies and supervisors responsible for the observation and monitoring of detainees and the identification and communication of serious medical needs of persons in custody to appropriate medical personnel;

11.     A pattern and practice of ignoring detainees' requests and needs for medical and/or psychiatric treatment, including the need for proper medications, and/or of providing unreasonable and patently insufficient treatment for detainees' conditions, and/or failing to properly monitor detainees who are treated, causing serious pain, suffering, injury, and/or death;

12.     Inadequate, deficient, or non-existent treatment plans for patients who were suicidal and experiencing significant mental illness;

13.     Inadequate quality control policies, procedures, and practices; inadequate critical incident review; inadequate mortality reviews; and inadequate identification and correction of serious deficiencies in policy and practices affecting the delivery and quality of medical and psychiatric services.

111.    In addition to the injuries sustained by the plaintiff herein the deliberate indifference of defendants **GUSMAN, GORE,** and **HIGGINS,** in their official capacities as Sheriff of Orleans

Parish, the Medical Director of OPP, and Mental Health Director of OPP, respectively, to the serious medical needs of detainees under their custody and control has resulted in numerous other instances of detainees suffering serious and oftentimes fatal injuries and illnesses.

112.     At all times pertinent herein the defendants acted unreasonably and with deliberate indifference and disregard for the constitutional and civil rights to life and safety of the deceased, Clifton Morgan.  The actions of the defendants were malicious, willful, wanton and reckless.

113.     Plaintiff further alleges that such acts and omissions as alleged herein were the proximate cause and cause in fact of the death of Clifton Morgan, the injuries suffered by the plaintiff, and the damages incurred.

## VI.     THIRD CAUSE OF ACTION

114.     Plaintiff repeats and re-alleges each and every allegations of the complaint.

115.     Clifton Morgan was a person with a disability under Section 504 and the Americans with Disabilities Act (ADA). He suffered from mental illness, depression, and schizophrenia, and was at high risk of suicide.

116.     Defendant Sheriff Marlin **GUSMAN** is in charge of OPSO which is a public entity that must comply with Section 504 and the Americans with Disabilities Act.

117.     Plaintiffs are entitled to relief against defendant **GUSMAN**, as he and OPSO had notice of Clifton Morgan's disability, had the means to reasonably accommodate his disability, and failed to make that reasonable accommodation.

118.     Section 504 of the Rehabilitation Act requires recipients of federal funds, including defendant **GUSMAN** and OPSO, to reasonably accommodate persons with disabilities in their facilities, program activities, and services. Section 504 further requires such recipients modify

such facilities, services, and programs as necessary to accomplish this purpose. Defendant **GUSMAN** and OPSO have been and are recipients of federal funds.

119.    The ADA defines discrimination as the failure to take necessary steps to ensure that no individual with a disability is excluded, denied services, segregated, or otherwise treated differently than other individuals because of the absence of services for the disabled. Such services include, inter alia, provisions necessary to achieve effective mental health care and to protect a person from suicide.

120.    Instead of accommodating Clifton Morgan's needs, defendant **GUSMAN** and OPSO denied Mr. Morgan services and programs available to others, including but not limited to access to appropriate medication and access to appropriate care and treatment that could have protected him from suicide and could have reduced the risk of harm of suicide. The failure to accommodate Clifton Morgan's disability was intentional and/or deliberately indifferent to Mr. Morgan's rights under Section 504 and Title II of the ADA and was a proximate cause of his death.

## VII.    FOURTH CAUSE OF ACTION

121.    Plaintiff repeats and re-alleges each and every allegation of the Complaint.

122.    The supplemental jurisdiction of the Court is invoked for all claims under state law.

123.    At all times described herein, the defendants, individually and collectively, acted negligently, with gross negligence and/or intentionally in denying reasonable and necessary medical care to Clifton Morgan, failing to properly monitor him, confining him in unsafe, unreasonable, and dangerous conditions providing him with access to material with which to harm himself, and in inflicting physical injury and severe emotional, mental and physical pain and suffering upon him, in violation of Louisiana constitutional and statutory law.

124.    The actions of the defendants caused the wrongful death of Clifton Morgan. At all pertinent times the defendant employees of the OPSO were acting in the course and scope of their employment and the defendant sheriff **GUSMAN** in his official capacity is vicariously liable for the injuries and damages incurred herein as a result of their actions.

125.    The defendants, **GORE, HIGGINS, DILEO, DAVIS, GATES, PHIPPS, MACKIE, GABRIEL, WATSON,** and **NEWIS** each acted in derogation of their duties as medical professionals and their treatment of Clifton Morgan was beneath the standard of care in the community.

126.    All defendants named herein are liable for the wrongs complained of herein by virtue of encouraging, aiding, abetting, counseling, ratifying and condoning the commission of the afore-described acts, by their failure to properly administer, organize, and staff the medical and correctional program and for the failure to properly screen, hire, train, supervise, and discipline persons under their supervision and control whose acts and omissions contributed to the death of Clifton Morgan.

127.    The defendants are liable individually and jointly (in solido) for their actions as alleged herein.

128.    Plaintiff further alleges that the above-described actions and omissions were the proximate cause and cause in fact of the injuries sustained herein.

## VIII.   DAMAGES

129.    As a result of the actions of the defendants as described above, damages have been incurred as follows:

1.      Clifton Morgan (deceased) suffered conscious and severe physical, mental, and emotional distress, pain and suffering prior to his death, and lost his life.

2. Della Morgan, the mother of Clifton Morgan, suffered emotional pain and suffering, past, present, and future; loss of support; and has suffered the loss of love, affection, and companionship of her son, Clifton Morgan, and has incurred funeral and burial expenses.

## IX.     PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that after due proceedings there be judgment rendered herein in plaintiff's favor and against all defendants individually and jointly, as follows:

1. Compensatory and punitive damages as prayed for herein;

2. Reasonable attorneys' fees, as provided in 42 U.S.C. § 1988 and 42 U.S.C. § 12205, and all costs of these proceedings and legal interest;

3. All other relief as appears just and proper to this Honorable Court.


Respectfully submitted,


s/ Stephen Haedicke_____
**STEPHEN J. HAEDICKE** (# 30537)
Co-counsel for Plaintiff
639 Loyola Ave., # 1820
New Orleans, LA 70113
(504)525-1328 Telephone
(504)910-2659 Fax
haedickelaw@gmail.com

-AND-

Emily Faye Ratner (# 35289)
Co-counsel for Plaintiff
316 S. Dorgenois St.
New Orleans, LA 70119
(504) 822-4455 Telephone
(504) 822-4458
msemilyfaye@gmail.co